## IN THE UNITED STATE DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| Amber McNeill,<br><br>             Plaintiff,<br><br>      v.<br><br>North Carolina Department of Public Safety<br><br>             Defendant | **CIVIL NO. 1:21-cv-285**<br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW, the Plaintiff, Amber McNeill, by and through the undersigned counsel, who does allege and say of Defendant North Carolina Department of Corrections as follows:

### PARTIES

1.      Plaintiff Amber McNeill (hereinafter "McNeill") is an individual and resident of Ellerbe, Richmond County, North Carolina and was employed by Defendant North Carolina Department of Public Safety within the State of North Carolina.

2.      Defendant North Carolina Department of Public Safety is a Department of the State of North Carolina and owns and operates correctional facilities across the State of North Carolina.

### JURISDICTION AND VENUE

3.      The Federal District Court for the Middle District of North Carolina has personal jurisdiction over the Defendant by virtue of the Defendant's residency within this State and by virtue of the incidents giving rise to this complaint having occurred within this State.

4.      The Federal District Court for the Middle District of North Carolina has subject matter jurisdiction over this action pursuant to § 28 U.S.C. 1331.

5.     The Greensboro Division of the Middle District of North Carolina is the appropriate

venue for this action pursuant to 42 U.S.C. § 2000e-5(f)(3) as such action is brought in the judicial

district in the state in which the unlawful employment practice is alleged to have been committed.

## STATEMENT OF FACTS

### Relevant Employment History

6.     In or about April of 2016 McNeill began working for the North Carolina

Department of Public Safety (hereinafter the "NCDPS") as a Correctional Case Manager with the

Division of Adult Correction and Juvenile Justice at Randolph Correctional Center.

7.     At all times relevant to this Complaint, McNeill was employed by the NCDPS and

NCDPS exercised control over McNeill's schedule, set the terms and conditions of her pay, and

established requirements and standards for her job performance.

8.     In October of 2017 McNeill transferred to the Morrison Correctional Institute

(hereinafter the "MCI").

9.     In or around October of 2017 McNeill was promoted to Correctional Officer II at

the MCI.

### Pattern of Sexual Harassment and Assault

10.     In or about late January or early February of 2018, Sergeant Christopher Sessoms[1]

(hereinafter "Sergeant Sessoms") was transferred from the MCI minimum custody unit to the MCI

medium custody unit.

11.     During this time period, McNeill worked with the MCI medium custody unit.

---

[1] Plaintiff adopts the ranks of each individual at the time such action occurred. Unless otherwise specified, any subsequent promotions, demotions, terminations, firings, or resignations are immaterial to Plaintiff's allegations.

12.     Sergeant Sessoms was transferred to the MCI medium custody unit pending investigation into an investigation that he sexually harassed and sexually assaulted a female officer within the MCI minimum custody unit.

13.     Immediately upon his transfer to the MCI medium custody unit, Sergeant Sessoms began making inappropriate sexual comments and advances towards McNeill.

14.     Sergeant Sessoms followed up such comments with consistent and reoccurring demands for McNeill to go on a date with him.

15.     Sergeant Sessoms made such comments and advances in full view of other employees. Sergeant Sessoms conduct earned him a reputation as McNeill's "creepy stalker."

16.     McNeill's superiors were aware of such instances and made jokes about Sergeant Sessoms persistence towards McNeill.

17.     McNeill made it clear to Sergeant Sessoms that she was not interested in such advances and found them uncomfortable.

18.     McNeill made it clear to her superiors that she was not interested in Sergeant Sessoms advances and that such advances made her uncomfortable.

19.     Sergeant Sessoms did not alter his inappropriate pattern of conduct.

20.     McNeill's superiors did nothing to force Sergeant Sessoms to alter his inappropriate pattern of conduct.

21.     Sergeant Sessoms inappropriate conduct escalated the longer he worked with the MCI medium security unit. In particular, Sergeant Sessoms

    a.    Increased the vulgarity of his derogatory comments to directly reference McNeill's breasts and buttocks;

b. Repeatedly demanded McNeill's phone number and, after several rebuffs by McNeill, acquired it himself by improperly accessing an emergency contact form;

c. Intentionally deviating from his work path to enter the facility when he was aware McNeill was working the entrance and would be required by NCDPS policy to initiate a full pat down by McNeill. During such searches, Sergeant Sessoms made it clear that he would intentionally deviate his path to force McNeill to thoroughly pat him down; and

d. Intentionally bump into McNeill to have an excuse to touch her;

22. McNeill's superiors were aware of all of the conduct outlined in Paragraph 21 and took no action to prevent Sergeant Sessoms for engaging in such conduct.

23. Sergeant Sessoms further disclosed to McNeill the reason behind his investigation and stated that nothing was going to happen to him as nobody believed his accuser anyway.

24. On information and belief, Sergeant Sessoms made such statement as a veiled threat to McNeill that she was powerless to stop Sergeant Sessoms from taking such actions.

25. The MCI minimum custody unit became shorthanded after another male employee was transferred to the medium custody unit pending investigation into allegations of undue familiarity with inmates. As a result, McNeill temporarily worked in the MCI minimum custody unit.

26. McNeill requested a permanent transfer to the MCI minimum custody unit in part to escape the continued harassment by Sergeant Sessoms.

27. McNeill made her transfer request by contacting Regional Security Coordinator Henry Nordan, a previous supervisor of McNeill, who was able to put McNeill directly into contact with MCI Superintendent Peter Buchholtz (hereinafter "Superintendent Buchholtz").

28.     Superintendent Bucholtz approved such transfer but required that McNeill report to him directly and to avoid other intermediaries.

29.     In the interim period between official transfer, Sergeant Sessoms's internal investigation was concluded and he was transferred back to the MCI minimum custody unit as McNeill's direct supervisor.

30.     Sergeant Sessoms's bragged to McNeill that nothing had happened to him and that she "better remember that" and pointed out that he was now her direct superior and the direct superior of the officer who had lodged the initial sexual harassment and sexual assault allegations against him.

31.     On information and belief, Sergeant Sessoms's meant this as a threat to McNeill to not even attempt to report his inappropriate behavior as nothing would happen.

32.     Sergeant Sessoms's harassment of McNeill continued and escalated upon his return to the MCI minimum custody unit. In particular, Sergeant Sessoms's conduct escalated in the following ways:

 a.  Sergeant Sessoms began physically groping and rubbing McNeill's breasts, buttocks, and other body parts;

 b.  Sergeant Sessoms continued his daily groping and rubbing despite repeated and explicit protests by McNeill for him to stop, including explicit demands by McNeill for Sergeant Sessoms to keep his hands off of her;

 c.  Sergeant Sessoms continued his sexually inappropriate verbal comments despite requests by McNeill to stop;

d.  Sergeant Sessoms would corner McNeill and make inappropriate sexual advances and remind McNeill that he was in a superior position to McNeill, implicitly threatening that she had no choice but to tolerate his assaults;

e.  Sergeant Sessoms frequently propositioned McNeill for dates or made other overtly sexual advances towards McNeill;

f.  Sergeant Sessoms accused McNeill of being sexually promiscuous, including that she was engaged in romantic relationships with other officers, and often such accusations would be made in the presence of both other officers and inmates; and

g.  Sergeant Sessoms frequently threatened to write up McNeill, and any other officer he in his sole discretion determined she must be involved in a relationship with, for a pretextual reason as both a punishment to McNeill for rejecting his advancements and out of jealousy towards any officer that he believed she was involved in a relationship with.

33.  NCDPS was aware of the accusations of sexual harassment and assault against Sergeant Sessoms and chose to transfer Sergeant Sessoms back to the same unit as the original complainant.

34.  NCDPS was aware of the Sergeant Sessoms's inappropriate comments and sexual assault against McNeill, as such actions were conducted openly in front of other employees of NCDPS, and chose to transfer Sergeant Sessoms to the same unit as McNeill.

35.  Superintendent Bucholtz was aware of Sergeant Sessoms's actions towards McNeill and did nothing to prevent the transfer of Sergeant Sessoms to the same unit as McNeill.

36.     On information and belief, NCDPS, Superintendent Bucholtz, and other direct supervisors of McNeill took no effective action to curtail or otherwise prevent the actions taken by Sergeant Sessoms.

37.     On information and belief, NCDPS, Superintendent Bucholtz, and other direct supervisors of McNeill took no action at all to attempt to curtail or otherwise prevent the actions taken by Sergeant Sessoms.

38.     On information and belief, NCDPS was aware that inmates at MCI complained of similar sexual assault and harassment by Sergeant Sessoms.

39.     After months of continued harassment, McNeill filed an official report with Sergeant Orville Leach (hereinafter "Sergeant Leach") regarding the harassment and sexual assault inflicted upon her by Sergeant Sessoms.

40.     Sergeant Sessoms learned of such report and confronted McNeill alone in an office and warned her by stating "remember Harris tried that shit and nobody believed her. Look how that turned out for her."

41.     After another officer confided in McNeill about similar harassment by Sergeant Sessoms, McNeill was again confronted demanding to know the identity of the officer who had confided in McNeill.

42.     At all times relevant Sergeant Sessoms remained the direct supervisor of both McNeill and officer Keneya Harris (hereinafter "Officer Harris"), the individual who had previously reported Sergeant Sessoms for sexual harassment and sexual assault.

### McNeill Learns of Abuse of Inmates

43.     During her employment at MCI, multiple inmates informed McNeill that Assistant Unit Manager Coritza Bennett (hereinafter "AUM Bennett") would interrogate inmates in her

office, threaten the inmates, and shred the grievances filed by the inmates without forwarding them to the proper investigatory authorities.

44.     These reports were corroborated by other officers and members of staff, who reported that AUM Bennett would order various officers and shift sergeants at MCI to harass and physically abuse inmates. This abuse included bringing inmates into AUM Bennett's office, covering the windows, playing music at a loud volume, and then physically abusing the inmates.

45.     In one incident, Officer David Sims (hereinafter "Officer Sims") bragged to McNeill that he had been ordered by AUM Bennett to bring an inmate to her office and "rough him up."

46.     Officer Sims further bragged that, apparently on belief of some technicality as to what made certain actions legal, if the beatings got "too rough" then they would take the inmate to AUM Bennett's private restroom so she would not be a witness.

47.     Officer Sims concluded his bragging by stating that he had "smacked that motherfucker so hard I knocked his teeth out."

48.     The inmate's family subsequently lodged multiple justified complaints related to the beating by Officer Sims.

49.     The reports against Officer Sims eventually culminated in a public confrontation, in front of McNeill and other officers, between Officer Sims and AUM Bennett. Such confrontation bordered on becoming a physical altercation in more than one instance.

50.     Another inmate, confronted Officer Sims over the previous beatings. In response, Officer Sims threw a box of protective gloves at the inmate, hitting him in the head, chased him down, continued to slap his head, and warned him he could be taken to AUM Bennett's office as well.

51. On multiple occasions McNeill witnessed AUM Bennett, and officers at AUM Bennett's behest, remove individuals from disciplinary segregation cells and take them to AUM Bennett's office.

52. On information and belief, the inmates removed from the disciplinary segregation cells were similarly beat and otherwise abused in AUM Bennett's office.

53. AUM Bennett further terrorized inmates by ensuring that complaints by inmates against other inmates were not anonymous. AUM Bennett explicitly allowed for inmates to physically harm the individuals who had lodged complaints against them.

54. One inmate, Dylan Watson, begged McNeill for help and protection from AUM Bennett and the inmates that AUM Bennet favored.

55. Dylan Watson was repeatedly cared for by medical staff due to beatings he had received by other inmates. This included Dylan Watson being repeatedly beaten in his sleep and an incident wherein microwaved hot water was poured down Dylan Watson's back, leading to permanent scarring.

56. Despite such beatings and attacks by other inmates, AUM Bennett failed to provide Dylan Watson with adequate protection. In desperation, Dylan Watson stole enough chicken from his work assignment, and intentionally was caught doing so, that he was put into a disciplinary segregation cell away from his attackers.

57. In another incident, AUM Bennett requested an inmate, Matthew Mitzel, identify which other inmates had committed the theft of a certain ID. After identifying the inmates responsible for the theft, AUM Bennett informed such inmates that Matthew Mitzel was the individual who had identified them.

58.     AUM Bennett informed the inmates with the knowledge that the inmates would retaliate against Matthew Mitzel in some form.

59.     Matthew Mitzel learned that, as a result of the other inmates learning he had identified him, he would be stabbed by another inmate. Matthew Mitzel went to McNeill and Officer Harris for help.

60.     McNeill and Officer Harris took Matthew Mitzel to a separate office, listened to his concerns and fears, and determined that protective custody was warranted according to MCI guidelines and policies.

61.     McNeill and Officer Harris reported the need for Matthew Mitzel to receive protective custody to Sergeant Leach and Sergeant Sessoms. McNeill and Officer Harris were required to report such need to Sergeant Leach and Sergeant Sessoms in accordance with MCI guidelines and policies.

62.     Sergeant Leach and Sergeant Sessoms had McNeill and Officer Harris transfer Matthew Mitzel to an unoccupied office, order the windows covered, and then threatened Matthew Mitzel for having the audacity to request protective custody.

63.     Sergeant Leach and Sergeant Sessoms continued their verbal tirade against Matthew Mitzel and demanded to know which inmate had the shank to stab him with.

64.     Sergeant Leach and Sergeant Sessoms threatened both to harm Matthew Mitzel and to put him back in general population and let him get stabbed if he did not reveal the identity of the individual who had the shank which he would be stabbed with.

65.     Matthew Mitzel was shaking, crying, and generally unresponsive due to the treatment he received from Sergeant Leach and Sergeant Sessoms.

66. McNeill and Officer Harris separated Matthew Mitzel from Sergeant Leach and Sergeant Sessoms. Matthew Mitzel stated he would only talk to McNeill and Officer Harris as he was afraid of both Sergeants Leach and Sessoms and AUM Bennett due to their treatment of him.

67. McNeill and Officer Harris were able to place Matthew Mitzel in protective custody despite Sergeants Leach and Sessoms actions and were able to discovery the identity of the individual with the shank.

68. Another inmate, Sam Sanchez, complained to McNeill that AUM Bennett discriminated against him and other Hispanic inmates based on their race.

69. In particular, Sam Sanchez stated that AUM Bennett had fired him from his work detail because she had promised the position to an African American inmate. Sam Sanchez further stated that most of the other Hispanic members of that work detail had similarly been fired and transferred to other, less desirable positions.

70. All of the Hispanic inmates who had been transferred out of the work detail were replaced with African American inmates.

71. McNeill, and other officers, complained of the abuse and disparate treatment directly to AUM Bennett and to other superiors at MCI.

72. AUM Bennett and other superiors at MCI continued in their physical abuse of inmates and discriminatory treatment towards inmates.

### McNeill Files A Formal Complaint

73. On or about September 24, 2018, McNeill could no longer tolerate the continued harassment by Sergeant Sessoms and the continued abuse and mistreatment of inmates she witnessed.

74. McNeill was informed by Sergeant Leach that if she filed the complaint that it would be a "career ender."

75. Despite this risk, McNeill filed an EEO Complaint regarding the conditions at MCI on September 24, 2018.

76. After filing her EEO Complaint, McNeill was called into AUM Bennett's office and forced to disclose all the details of her complaint to AUM Bennett.

77. Under the procedures of both NCDPS and MCI, AUM Bennett was not the proper individual to investigate the allegations within the complaint filed by McNeill.

78. AUM Bennett continued her interrogation of McNeill until AUM Bennett was satisfied that she had drained all the information she could out of McNeill.

79. While McNeill was still at work, AUM Bennett revealed the details of McNeill's complaint to various staff members. In addition to revealing the details of the complaint to various staff members, AUM Bennett additionally required McNeill to cover the shifts of such staff members while AUM Bennett was revealing such details.

80. Investigations of complaints are required to be conducted confidentially and should not identify the complainant.

81. AUM Bennett intentionally broke these requirements.

82. On information and belief, AUM Bennett intentionally informed staff members of the details of the investigation in an attempt to intimidate and retaliate against McNeill for filing her complaint.

83. On information and belief, AUM Bennett provided more information than necessary to staff members when conducting her investigation in order to give staff members clear indication as to what answers to provide to avoid being found culpable.

84.     AUM Bennett directly informed Sergeant Sessoms about the allegations McNeill had made against him.

85.     The day after filing her complaint, inmates questioned McNeill about the allegations in her complaint, further demonstrating the breach of confidentiality that is supposed to accompany such complaint.

86.     The same day, Sergeant Leach approached McNeill and demanded she retract her complaint.

87.     Harassed by other staff members, her superiors, and inmates, McNeill announced her desire to leave work after two hours of her shift as she unable to control her anxiety and panic attacks caused by the response to her complaint.

88.     Sergeant Leach refused to allow McNeill to leave and threatened to put McNeill on investigation for abandoning her post.

89.     Sergeant Leach continued to refuse McNeill's request to leave and informed AUM Bennett of McNeill's desires.

90.     AUM Bennett went to McNeill's post and shut the door behind her. AUM Bennett asked McNeill of the reasons behind her desire to leave.

91.     AUM Bennett physically blocked McNeill from leaving and began berating McNeill.

92.     AUM Bennett suggested to McNeill that if McNeill felt that there was a hostile work environment, then perhaps AUM Bennett should just have McNeill transferred to another unit.

93.     AUM Bennett became irate and accused McNeill of attempting to blame AUM Bennett and Sergeant Leach for all the issues in the work environment. AUM Bennett followed this up by attempting to snatch McNeill's written statement from her bag.

94.     AUM Bennett threatened to write false statements about McNeill and indicated that Sergeant Leach would support such statements.

95.     Eventually, McNeill was able to slip past AUM Bennett and leave the facility.

96.     After leaving MCI, McNeill contacted Henry Nordan and informed him of the situation since Superintendent Buchholz was unavailable.

97.     Henry Nordan thereafter advises McNeill to contact the superintendent.

98.     Henry Nordan, after learning of the reported sexual harassment and assault inflicted upon McNeill, offered to give McNeill a hot bath and oil massage.

99.     On September 26, 2018, McNeill submitted an approximately twenty-page statement to Superintendent Buchholtz and Michael Scarboro (hereinafter "Scarboro").

100.    McNeill had a meeting with Scarboro and Superintendent Buchholtz. In such meeting, Scarboro and Superintendent Buchholtz informed McNeill that they had read the complaint and would properly respond to the allegations.

101.    McNeill was granted a short period of medical leave to recover from the mental trauma caused by the months of sexual assault and harassment, from witnessing the abuse of the inmates, and from the failure for her complaints to be addressed.

102.    Upon return from her medical leave, McNeill delivered a doctor's note to Superintendent Buchholtz personally and attempted to report the inmate abuse again.

103.    Superintendent Buchholtz cut McNeill off and told he that he would handle it when she returned to work and offered McNeill a Sergeant's position.

104. On information and belief, Superintendent Buchholtz intended the promotion to be a bribe to McNeill to prevent her from continuing in her desire to report the inmate abuse.

105. On information and belief, Superintendent Buchholtz intended the promotion to be a bribe to McNeill to prevent her from continuing in her desire to report the sexual harassment and assault inflicted upon her by Sergeant Sessoms.

106. After filing her EEO complaint, McNeill was retaliated against by AUM Bennet and other members of the administration at MCI. In particular,

    a. McNeill was denied voluntary shared leave in scenarios in which other employees of MCI were granted voluntary shared leave;

    b. McNeill had multiple paychecks delayed or declined for unexplained reasons;

    c. McNeill has had her employer offered insurance lapse twice;

    d. McNeill has been locked out of MCI's internal system, Beacon, on more than one occasion;

    e. McNeill had her NCDPS issued email revoked; and

    f. McNeill was placed under investigation on five different occasions based on false statements made by employees of NCDPS.

107. After filing her EEO Complaint, NCDPS moved Sergeant Sessoms to the medium custody portion of MCI.

108. NCDPS failure to remove Sergeant Sessoms from MCI had the practical effect of continued frequent contact between McNeill and Sergeant Sessoms.

109. On information and belief, NCDPS failure to move Sergeant Sessoms to a different facility was in violation of its own policy for handling complaints of the nature McNeill filed.

110.    In or around March of 2019, Sergeant Sessoms was relocated back to the unit in which McNeill worked.

### McNeill's Mental Health

111.    During McNeill's employment with NCDPS she developed anxiety and depression.

112.    McNeill's anxiety and depression arose directly out of the continued sexual assault and harassment she was forced to endure during her employment at MCI.

113.    McNeill's anxiety and depression arose directly out of witnessing continued physical abuse of inmates while she was employed at MCI.

114.    McNeill sought, and received, appropriate treatment for such conditions.

115.    McNeill provided proper documentation regarding such diagnosis to her superiors at MCI.

116.    McNeill requested appropriate time off in relation to these conditions.

117.    McNeill's supervisors at MCI denied these requests for time off.

118.    McNeill's supervisors at MCI stated that McNeill had not provided sufficient paperwork.

119.    McNeill provided proper paperwork to support her need to take time off.

120.    McNeill's supervisors consistently rejected, or threatened to reject, doctor's notes provided to McNeill.

121.    The reasons provided by McNeill's supervisors were not valid and in line with the guidelines used by MCI and applied to all other employees of MCI.

122.    McNeill's supervisors denial of her requests for time off became more intense after McNeill filed the EEO Complaint.

### McNeill Seeks Resolution Outside of the NCDPS

123.    McNeill attempted to file a criminal complaint against Sergeant Sessoms with the Richmond County Sherriff's Office for the actions alleged in the above paragraphs.

124.    McNeill was informed by Detective Mike Watson that the Richmond County Sheriff's Office had been advised by MCI that Sergeant Sessoms had been written up only for fraternization with subordinates.

125.    The Richmond County Sheriff's Office informed McNeill that they had closed their investigation into Sergeant Sessoms on the grounds that the case was unfounded as it arose out of fraternization.

126.    MCI was aware at all times that no consensual relationship existed between Sergeant Sessoms and McNeill.

127.    On information and belief, MCI purposefully mislead the Richmond County Sheriff's Office to protect Sergeant Sessoms and, by extension, themselves.

128.    On or about August 18, 2019, McNeill drafted and sent a whistleblower complaint addressed to Roy Cooper, governor of the state of North Carolina, Joshua Stein, Attorney General of North Carolina, and Bob Schurmeir, director of the State Bureau of Investigation.

129.    The above-mentioned whistleblower complaint contained all of the above allegations of fact against Sergeant Sessoms, AUM Bennett, Superintendent Buchholtz, and other employees of NCDPS.

130.    The above-mentioned whistleblower complaint also contained allegations of retaliation against McNeill for the complaints she had lodged.

131.    A copy of the whistleblower complaint was sent to both Superintendent Buchholtz and AUM Bennett.

132.    On or about May 14, 2019, McNeill filed an initial charge with the Equal Employment Opportunity Commission (hereinafter the "EEOC") alleging discrimination on the basis of sex and retaliation in connection with her filing of a formal EEO complaint on September 26, 2018.

133.    On or about October 2, 2019, McNeill filed a second charge with the EEOC alleging discrimination on the basis of disability and retaliatory discharge in relation to the original EEOC Complaint.

134.    The EEOC issued a dismissal and notice of rights to McNeill in both issues on January 6, 2021.

### FIRST CLAIM FOR RELIEF
**(Discrimination on the Basis of Sex in Maintenance of a Hostile Work Environment in Violation of 42 U.S.C. §2000e-2(a)(1).**

135.    The preceding paragraphs are re-alleged as if fully stated herein.

136.    Plaintiff was employed by Defendant NCDPS in an at-will capacity until her termination on or about April 16, 2020.

137.    Defendant NCDPS discriminated against Plaintiff on the basis of sex by maintaining a hostile work environment. In particular,

    a.  Plaintiff was subject to harassment on the basis of sex. This harassment was, in its most direct form, carried out by Sergeant Sessoms and was compounded by comments by other employees of Defendant NCDPS mocking or otherwise belittling Plaintiff for the harassment she endured;

    b.  Sergeant Sessoms was Plaintiff's direct supervisor;

    c.  Plaintiff made clear to both Sergeant Sessoms and her superiors within Defendant NCDPS that such harassment was unwelcome;

d. The conduct by Sergeant Sessoms, compounded by the inaction of NCDPS at large, was sufficiently severe to alter the conditions of Plaintiff's employment to create an abusive working environment; and

e. Liability should be imputed to Defendant NCDPS as Defendant NCDPS was aware of such harassment through the open nature of such harassment and through multiple avenues of complaint to multiple individuals employed by NCDPS and failed to address such harassment. Furthermore, Defendant NCDPS, while aware of such harassment, placed Plaintiff's tormentor in a direct position of power over her.

138. Defendant NCDPS maintenance of the hostile work environment, as alleged above, was and is in violation of 42 U.S.C. §2000e *et seq*.

139. Plaintiff was damaged by Defendant NCDPS's actions in an amount exceeding $25,000.00, to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to Defendant NCDPS's maintenance of a hostile work environment.

140. Defendant NCDPS's actions as alleged in this Complaint were willful and wanton, were in reckless disregards of the Plaintiff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

## SECOND CLAIM FOR RELIEF
### (Retaliatory Discharge in Violation of 42 U.S.C. §2000e-3(a))

141. The preceding paragraphs are re-alleged as if fully stated herein.

142. Plaintiff was employed by Defendant NCDPS in an at-will capacity until her termination on or about April 16, 2020.

143.    Plaintiff engaged in protected activity by filing workplace complaints regarding the sexual assault and harassment by Sergeant Sessoms.

144.    Plaintiff engaged in protected activity by filing a complaint with the EEOC alleging discrimination on the basis of sex and maintenance of a hostile work environment.

145.    Plaintiff was terminated by Defendant NCDPS subsequent to her filing of her workplace complaints and her complaint to the EEOC.

146.    Defendant NCDPS terminated Plaintiff in retaliation for her filing of workplace complaints and/or her complaint to the EEOC.

147.    Defendant NCDPS stated reason for such termination is pretextual.

148.    Defendant NCDPS's termination of Plaintiff was and is in violation of violation of 42 U.S.C. §2000e *et seq*.

149.    Plaintiff was damaged by Defendant NCDPS's actions in an amount exceeding $25,000.00, to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to Defendant NCDPS's maintenance of a hostile work environment.

150.    Defendant NCDPS's actions as alleged in this Complaint were willful and wanton, were in reckless disregards of the Plainitff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

### THIRD CLAIM FOR RELIEF
### (Wrongful Discharge in Violation of the First and Fourteenth Amendment)

151.    The preceding paragraphs are re-alleged as if fully stated herein.

152.    Plaintiff was employed by Defendant NCDPS in an at-will capacity until her termination on or about April 16, 2020.

153.    Defendant NCDPS terminated Plaintiff in retaliation for her internal complaints and external whistleblower complaint regarding the physical abuse and mistreatment of inmates by AUM Bennett and other officers of MCI.

154.    Defendant NCDPS terminated Plaintiff in retaliation for her internal complaints and external whistleblower complaint regarding the disparate treatment of inmates of certain ethnicities by AUM Bennett and other officers of MCI.

155.    Ongoing systematic physical abuse of inmates by officers and management personnel of a state-run prison is a matter of public interest.

156.    Ongoing discrimination against inmates on the basis of ethnicity by officers and management personnel of a state-run prison is a matter of public interest.

157.    Terminating an employee for speech related to a matter of public interest is a violation of the First Amendment, as incorporated to States via the Fourteenth Amendment.

158.    Plaintiff may properly bring an action against Defendant NCDPS under 42 U.S.C. § 1983.

159.    Plaintiff was damaged by Defendant NCDPS's actions in an amount exceeding $25,000.00, to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to Defendant NCDPS's maintenance of a hostile work environment.

160.    Defendant NCDPS's actions as alleged in this Complaint were willful and wanton, were in reckless disregards of the Plainitff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

### FOURTH CLAIM FOR RELIEF
**(Discrimination on the Basis of Disability in in Violation of 42 U.S.C. §12101 *et seq*.**

161.    The preceding paragraphs are re-alleged as if fully stated herein.

162. Defendant NCDPS employed Plaintiff in an at-will capacity until her termination on or about April 16, 2020.

163. Plaintiff was terminated due to her disability, specifically her diagnosis of anxiety and depression.

164. Defendant's termination of Plaintiff was and is in violation of 42 U.S.C. §12101, *et seq*.

165. Defendant was and is damaged by Plaintiff's actions in an amount more than $25,000.00 to be proven with more specificity at trial. This amount includes lost wages and compensatory damages related to the Defendant's wrongful discharge of Plaintiff.

166. The Defendant's actions as alleged in this Complaint were willful and wanton, were in reckless disregard of the Plaintiff's rights, and the Plaintiff is entitled to recover punitive damages against the Defendant pursuant to N.C. Gen. Stat. §1D-15.

NOW WHEREFORE the Plaintiff does pray the Court as follows:

1. That the Plaintiff have and recover a judgment against Defendant in an amount to be proven more specifically at the time of trial, which judgment shall include lost wages, lost benefits, and economic and compensatory damages as allowed by law.

2. That an award of punitive damages against the Defendant be assessed for the Defendant's willful and wanton disregard of the Plaintiff's rights.

3. That all issues so triable be tried by jury.

4. That the cost of this action be taxed against the Defendants.

5. That an award of attorneys' fees be entered in favor of Plaintiff.

6. For such further and other relief as the Court deems just, fitting, and proper.

This is the 6th day of April, 2021.

**Pope McMillan, P.A.**
Attorneys for the Plaintiff

By:     /s/ Clark D. Tew
        Clark D. Tew
        N.C. State Bar No. 41632
        P.O. Drawer 1776
        Statesville, NC 28687
        (704) 873-2131
        ctew@popemcmillan.com